**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **No. 23-cr-190-02 (ABJ)** |
| **D'MARRELL MITCHELL** | : | |

**SUPPLEMENT TO MOTION TO SUPPRESS EVIDENCE**
**OBTAINED AS A RESULT OF UNCONSTITUTIONAL WARRANTS**

Pursuant to the Fourth Amendment to the United States Constitution, Mr. D'Marrell Mitchell, through undersigned counsel, respectfully submits this supplement to Mr. Mitchell's motion to suppress the use of all evidence obtained based on a warrant for cellphones seized on May 27, 2021. He submits this on behalf of himself and Ms. Gause to the extent she choses to join his submission.[1]

1. **The evidence from the Anne Arundel extraction of Ms. Gause's phone must be suppressed.**

According to a proffer by government counsel, all the electronic evidence from Ms. Gause's phone was obtained from the extraction performed by the Anne Arundel police (the "Anne Arundel extraction") pursuant to a June 2021 warrant they obtained out of Maryland (the "Anne Arundel warrant"). Apparently, the FBI never performed an extraction of her cell phone themselves after they obtained a warrant to do so on November 19, 2021 ("the FBI cell phone warrant"). Because the FBI's search of the Anne Arundel extraction exceeded the scope of what both the Anne Arundel and FBI cell phone warrants allowed, all the evidence obtained from that extraction must be suppressed.

   a. *The search of the Anne Arundel extraction exceeded the scope of the Anne Arundel warrant*

---

[1] For this reason, Mr. Mitchell makes arguments for which Ms. Gause has standing but he, at least arguably, does not.

1

"The Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 394 n.7 (1971). And it is settled law that items seized outside the scope of a search warrant cannot be admitted against a criminal defendant. *Horton v. California*, 496 U.S. 128, 140 (1990).

In searching documents or electronic records, the need to prevent "general, exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), is "particularly acute," *United States v. Heldt*, 668 F.2d 1238, 1260 (D.C. Cir. 1981). "Unlike searches for tangibles, document searches … tend to involve broad disclosures of the intimacies of private lives, thoughts and transactions." *Id.* In searching a phone, therefore, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy." *United States v. Ali*, 870 F. Supp. 2d 10, 39 (D.D.C. 2012) (quotation marks omitted).

Whether "a search exceeds the scope of a search warrant is an issue [] determine[d] through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Hitchcock*, 286 F.3d 1064, 1071 (9th Cir. 2002), *opinion amended and superseded* by 298 F.3d 1021 (9th Cir. 2002) (Mem.). "The subjective state of mind of the officer executing the warrant is not material" to this inquiry, *id.*, because "[a] policeman's pure heart does not entitle him to exceed the scope of a search warrant, nor does his ulterior motive bar a search within the scope of the search warrant, where the warrant was properly issued," *United States v. Ewain*, 88 F.3d 689, 694 (9th Cir. 1996).

The Anne Arundel warrant authorized something specific:  looking through certain categories of information for evidence of the May 26, 2021 CVS robbery. *See* ECF 190-3.  But that is not what Agent Potrafka did.  As Agent Potrafka testified, a warrant that authorizes him to

look through text messages and emails does not authorize him to look through a device's search history. A review of the plain terms of the Anne Arundel search warrant, which Agent Potrafka was in possession of and reviewed, make clear that he and his colleagues could not review Ms. Gause's search history. *See* ECF 190-3 at 2 (listing subscriber information, ingoing and outgoing calls, text messages, cell tower locations, life of account information, contacts, photos and videos; no mention of search history). But they reviewed evidence of her search history anyway. *See* Mitchell Ex. 2-3.

Agent Potrafka and his colleagues also did not limit themselves to the specific crime that Anne Arundel sought the warrant for. As Agent Potrafka testified, when scoping a phone, agents look through the Cellebrite extraction for the evidence that the warrant authorized them to seize. But that is not what the FBI did here. They did not review the phone data in order to scope it down to the May 26, 2021 robbery that the Anne Arundel warrant was for. Instead, they went into Ms. Gause's Anne Arundel extraction to rifle around for evidence of five different robberies (none of which were the Anne Arundel robbery) and, apparently, a host of other crimes too. The warrant authorized none of this.[2] Because the search of the Anne Arundel extraction was never confined to the scope of the Anne Arundel robbery, but instead the FBI rummaged specifically for evidence of other crimes, all evidence obtained pursuant to it must be suppressed.

However, even assuming arguendo that some aspect of the FBI's search was within the terms of the Anne Arundel warrant (which it was not), suppression is still necessary. This is

---

[2] For avoidance of doubt, the plain view doctrine does not save the government here. The government is authorized to seize evidence of another crime that they see when they are lawfully conducting a search. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (police may seize evidence in plain view if they "are lawfully in a position from which they view" it). Here, the Anne Arundel warrant did not authorize them to search for evidence of the D.C. robberies. So, the fact that they went into the phone looking for evidence of those robberies to begin with means nothing they saw was properly in plain view.

because "flagrant disregard for the limitations in a warrant" can "transform an otherwise valid search into a general one, thereby requiring the entire fruits of the search to be suppressed." *Heldt*, 668 F.2d at 1259. When "law enforcement officers [] conduct[] a documents search as if no limiting warrant existed, rummaging at will among [a defendant's] offices and files, then the mere existence of a valid-but practically irrelevant warrant for certain specified documents would not be determinative of whether the search was so unreasonable as to require suppression of everything seized." *Id.*

The "proper execution of a search warrant for numerous documents," like one of electronic files on a cell phone, "requires three things: preparation; obedience to area limitations; and restrictions on seizure of items not mentioned particularly in the warrant." *Id.* at 1261. That did not happen here. Indeed, no effort at all appears to have been made by Agent Potrafka and his colleagues to stay within the scope of the Anne Arundel warrant. Instead, his search of Ms. Gause's extraction was the kind of "exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. at 467, that the Fourth Amendment protects against. Agent Potrafka's testimony makes plain that he "conducted a documents search as if no limiting warrant existed, rummaging at will among [Ms. Gause's] files." *Heldt*, 668 F.2d at 1259. Based on Agent Potraka's testimony, the FBI treated the Anne Arundel warrant as if it was "practically irrelevant" and imposed no limits at all. *Id.* The Fourth Amendment cannot condone such a search. As a result, *all* of the evidence stemming from the extraction of her phone must be suppressed.

       b. *The search of the Anne Arundel extraction exceeded the scope of FBI cell phone warrant.*

The fact that the FBI went and obtained a search warrant for Ms. Gause's phone does not immunize the FBI's efforts to rummage through the Anne Arundel extraction. First and foremost, the FBI cell phone warrant does not authorize the FBI to seize the Anne Arundel extraction and

search it.  Instead, it authorizes them to seize the four phones in their custody—with the Anne Arundel extraction notably omitted as an item to be seized—and then perform an extraction of those seized phones.  *See* ECF 190-1 at 1-3, 6.  No mention is made of searching the extraction already in the FBI's possession.  Thus, the FBI's search of the Anne Arundel extraction—both before and after obtaining the FBI cell phone search warrant—was unlawful and the fruits of that search must be suppressed.  *Horton*, 496 U.S. at 140.

Furthermore, even if searching the Anne Arundel extraction, as opposed to the FBI extracting the phone themselves, was somehow permitted under the FBI cell phone warrant, the FBI still exceeded the scope of what that warrant authorized.  As Agents Van Dyk and Potrafka testified, even before the agents obtained the FBI cell phone warrant, they were rummaging through Ms. Gauses's phone for evidence of numerous other crimes—including shootings, different robberies, and other crimes in states across the country.  Agent Potrafka testified that he obtained the FBI cell phone search warrant here in order to continue to search for evidence of all the other out-of-state crimes he had been interested in—not the five DC-area robberies he had been investigating.  The problem:  the warrant he got authorized him to search the phone for the evidence of *those five robberies specifically*.  In other words, Agent Potrafka admitted that he sought this warrant in order to continue to perform a general exploratory search of the phone that, by the FBI cell phone warrant's plain terms, it did not authorize.  Indeed, no warrant would ever authorize such a search.  General warrants are not permitted under the Fourth Amendment.  *Stanford v. Texas*, 379 U.S. 476, 510 (1965).  Because Agent Potrafka flagrantly disregarded the limits of the FBI warrant, even assuming the Anne Arundel extraction evidence was somehow obtained pursuant to it, that evidence must still be suppressed.

> c.  *AUSA Nelson could not authorize Agent Potrafka to exceed the scope of the search warrants*

5

The government may argue that the evidence should not be suppressed due to the "good faith" exception to the exclusionary rule. The government will likely emphasize that Agent Potrafka testified that he spoke with AUSA Nelson before he reviewed the Anne Arundel extraction and that he gave AUSA Nelson regular updates on what he was reviewing and finding in the phone. Candidly, this testimony about the advice Agent Potrafka received from AUSA Nelson is not credible. AUSA Nelson is an experienced, longstanding member of the U.S. Attorney's office, and it beggars' belief that he told Agent Potrafka that the Anne Arundel warrant authorized him to look at search history when it did not and to search for evidence of other offenses when it did not.

In any event, "an attorney's advice cannot transform the officer's patently unlawful activity into objectively reasonable conduct." *Poulakis v. Rogers*, 341 F. App'x 523, 532 (11th Cir. 2009); *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004) ("[A] waive of the prosecutor's wand cannot magically transform an unreasonable [action] into a reasonable one."); *Watertown Equip. Co. v. Norwest Bank Waterton, N.C.*, 830 F.2d 1487, 1495 (8th Cir. 1987) ("[T]he advice of counsel alone will not satisfy an official's burden of acting reasonably."). While seeking advice from a prosecutor may help shield an officer from civil liability, it does not change the fact that Agent Potrafka and his team's rummaging exceeded the scope of the warrant.

Indeed, the good faith exception has no role to play here. The good faith exception allows officers to rely on search warrants that lack probable cause if the officers act in good faith and reasonable reliance on the warrant. *United States v. Leon*, 468 U.S. 897, 926 (1984). But it does not apply where "the issue is whether the search was conducted within the scope of a warrant." *Hitchcock*, 286 F.3d at 1071.

For these reasons, the evidence obtained pursuant to the Anne Arundel extraction must be suppressed.

6

2.  **The FBI cell phone warrant was obtained because of law enforcement's false statement that they had not reviewed evidence from the Anne Arundel extraction.**

It is black letter law that the government cannot violate the Fourth Amendment and then turn around and obtain a warrant in order to insulate themselves from their own misconduct. *See Murray v. United States*, 487 U.S. 533 (1988). Here, that is what the government did. It rifled through Ms. Gause's phone without lawful authority and then obtained a search warrant to search her phone and Mr. Mitchell's by lying about its conduct. Had the government disclosed its illegal behavior, it is likely the warrant would have never issued, and this provides an independent reason for suppression.

In *Murray v. United States*, 487 U.S. 533 (1988), police officers illegally searched a warehouse without a warrant. They then returned the following day with a warrant. In applying for that warrant, they did not mention the prior illegal entry or include any recitations of their observations made during that entry. Below, the circuit court had held that the search was valid and untainted by the prior illegal entry because none of what the officers observed inside the warehouse was included in their probable cause submission. The Supreme Court, however, reversed explaining that "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," then the evidence seized pursuant to that warrant was still tainted and had to be suppressed. *Id.* at 542.

This case is the digital version of *Murry*. Here, Agent Potrafka testified that the reason he sought the search warrant for the phones was because of what he was seeing on the Anne Arundel extraction. As discussed at length above, he and his team's search exceeded the scope of the Anne Arundel warrant and was not lawful. Had Agent Potrafka accurately relayed that fact in his affidavit—instead of including a patently false statement about how he had not reviewed the

extraction[3]—it is likely the FBI cell phone warrant would have never issued at all because the Magistrate Judge would have understood that the evidence had been illegally obtained under *Murray*.

For this independently sufficient reason, the evidence obtained from Ms. Gause and Mr. Murray's phones pursuant to the FBI cell phone warrant must be suppressed.

### 3. The FBI unreasonably delayed in obtaining a search warrant for the phones.

The evidence obtained from the Anne Arundel extraction as well as the evidence obtained from extracting Mr. Mitchell's phone must also be suppressed for an additional, separate reason: the FBI unreasonably delayed in getting the warrants.

A seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes upon the defendant's possessory interests." *United States v. Jacobsen*, 466 U.S. 109, 125 (1984). When the government unreasonably delays in getting a warrant that delay itself can be a suppressible Fourth Amendment violation. *See, e.g.*, *United States v. Pratt*, 915 F.3d 266, 272 (4th Cir. 2019). Here, the federal government took custody of the phones on September 30, 2021 and obtained a search warrant for them on November 19, 2021. This delay of 50 days is substantially longer than the delay other courts have found supports suppression. *See, e.g.*, *United States v. Mitchell*, 565 F.3d 1347, 1351-52 (11th Cir. 2009) (ordering suppression of evidence from a computer hard drive after 21-day delay in getting a search warrant); *Pratt*, 915 F.3d at 272 (ordering suppression of evidence from a smartphone after 31-day

---

[3] Under *Franks*, a false statement jeopardizes a warrant where it is knowingly or recklessly made. Here, Agent Potrafka's statement that he did not know about the inclusion of the false statement is dubious. However, the Court does not need to decide whether he was being truthful when he said he failed to read that part of the warrant before swearing to its accuracy. Even assuming that is true, his conduct is reckless under *Franks*. *See, e.g., United States v. McKey*, No. 4:07-CR-00062-01 GTE, 2007 WL 2601206, at *6 (E.D. Ark. Sept. 10, 2007) ("The Court holds that Officer Quinn's failure to carefully read the draft affidavit to be sure the that information contained therein was true and accurate constitutes reckless disregard.").

delay in getting a search warrant); *Waldrip*, 2019 WL 13143479, at *7 (ordering suppression after 5-day delay in getting a search warrant); *United States v. Tisdol*, 544 F. Supp. 3d 219, 227 (D. Conn. 2021) (ordering suppression of evidence from a smartphone after 34-day delay in getting a search warrant); *see also United States v. Dass*, 849 F.2d 414, 414-15 (9th Cir. 1988) (affirming suppression where there was a delay of 7-23 days in getting a search warrant to search seized packages); *United States v. Bumphus*, 227 A.3d 559, 568 (D.C. 2020) (affirming suppression where there was a four day delay between the seizure of the vehicle and other items (e.g., cell phone) and the warrant to search it).

Here, the government claims the search warrants were sought in a timely manner because: "The defendants carried out robberies up and down the east coast—a strategy that made it difficult for law enforcement to connect the robberies to each other and the defendants. Given the number of robberies involved, the number of perpetrators, and the coordination between different law enforcement agencies, a delay of a month and a half is relatively short." Gov. Opp. at 14. As explained below, the government had already connected the robberies to each other and to Ms. Gause by the time they took the cell phones into their custody on September 30, 2021. There was no reason for any delay beyond that point.

In any event, at the suppression hearing, the government's testimony was different. Neither Agent Van Dyk nor Agent Potrafka testified that they waited to submit the warrant because they needed to coordinate with other agencies or perform additional investigation (as noted, they had the information they needed in their possession). Instead, they testified that they waited because they initially thought they did not need another warrant. They thought they could dig through Ms. Gause's raw cell-phone extraction without exception—which at no point had been scoped to the Anne Arundel warrant—to look for evidence of crimes that the Anne Arundel warrant never

authorized them to look for.  If the officers had time to look through Ms. Gause's cell phone extraction illegally, however, they certainly had time to apply for a warrant to be able to review it legally.  Their belief that they somehow had the authority to review the extraction is wrong as matter of law and objectively unreasonable.

> a. *The FBI had the information they included in the search warrant at the time they took custody of the cell phones.*

According to the testimony by Agents Van Dyk and Potrafka, the FBI took custody of the four cell phones and the extraction from Ms. Gause's phone on September 30, 2021.  By that date, the FBI and US Attorney's office knew the probable cause information they included in their November 19, 2021 cell phone warrant.  Yet, they did not promptly seek that warrant.  Instead, they waited 50 days to get it.

The cell phone warrants, which the FBI submitted on November 19, 2021, contain three categories of probable cause information: (1) background on the Anne Arundel robbery from May 26, 2021; (2) the facts of the five robberies the FBI was investigating; and (3) the fact that Ms. Gause's phone pinged at all of five robberies the FBI was investigating.

As Agent Potrafka testified, the FBI already knew the background on the Anne Arundel robbery before they took custody of the phones because they talked to Detective Shapelow before getting them.  Furthermore, Agent Potrafka testified that he received a copy of the Anne Arundel warrant—which detailed the May 26, 2021 robbery—by the time he took custody of the phones, if not before.

The FBI cell phone warrant's discussion of the May 26, 2021 robbery was copied virtually verbatim from the Anne Arudel warrant. *See* Appendix A.  The only changes the FBI made were small wordsmithing edits and some reorganizing of the order in which the information was presented.  *See id.*

The FBI also knew everything about the five robberies discussed in the FBI cell phone warrant at the time they received the phones. The cell phone warrant's descriptions of those robberies were taken directly from the November 2020 tower dump warrant, which the FBI obviously had in its possession when it received the phones in September 2021, and which was itself included as an attachment to the cell phone warrant. *See* ECF 190-1 (Ex. 1) at 17-21.

Finally, the FBI also knew that Ms. Gause's phone had pinged in the vicinity of all five robberies before they took custody of the cell phones. As Agent Van Dyk recognized, the FBI received a copy of the AT&T tower dump in July 2021.[4] And, by August 10, 2021, they realized a phone number ending in x7885 had pinged near all five robberies. And, by September 13, 2021 at the latest, the FBI had connected that number to Ms. Gause and knew precisely when the phone pinged in relation to when the five robberies occurred. In fact, all of the information in the FBI cell phone warrant about when Ms. Gause's phone pinged in relation to the robberies lines up directly with a chart on page 3 of the FBI Tactical Intelligence Report dated September 13, 2021. There is no reason the FBI could not have applied for the FBI cell phone warrant immediately upon receiving the phones from Anne Arundel.

> b. *If the FBI had time to illegally review Ms. Gause's cell phone extraction, they had time to apply for warrant that gave them lawful authority to examine it.*

Agent Potrafka's testimony about the reason for his delay in getting the warrant is straightforward. Although he testified he was busy at the time, he did not testify that he was so busy that he could not draft a warrant. On the contrary, he testified that he is no busier today than he is then and today he manages to get warrants submitted in under 28 days.

---

[4] Agent Potrafka actually testified the FBI had a received a copy of that tower dump in February 2021, but no one had sent it to him.

Instead, according to Agent Potrafka, the reason he and his team did not get a warrant sooner is because AUSA Nelson purportedly told him that they did not need a warrant because the Anne Arundel warrant sufficed. To the extent this advice was ever given, it is nonsense and does not justify the delay.

As explained above, the Anne Arundel warrant did not authorize Agent Potrafka and his team to do a general, exploratory rummaging through the Anne Arundel extraction for any evidence of crimes the FBI was interested in. It authorized Maryland authorities to investigate the May 26, 2021 robbery and to only look at specific categories of information (texts, emails, etc.) and not search history. Agent Potrafka did not limit himself to that information, as the law requires. And indeed, the Court can know that he knew better because he testified that he knows he cannot look at search history when a warrant does not authorize him to do so. Furthermore, as discussed above, reliance on advice from an AUSA does not insulate his conduct from Fourth Amendment scrutiny. If the FBI had time to illegally search a cell phone extraction, they had time to get a warrant for that phone and the other phones in their custody.

### c. The delay was unreasonable

The other factors courts consider when deciding whether delay is unreasonable point in Mr. Mitchell's favor too. As the government has admitted, neither Ms. Gause nor Mr. Mitchell consented to the seizure of their cell phones nor voluntarily shared their contents. This supports the conclusion that they did not diminish their interest in the cell phones. *See United States v. Pratt*, 915 F.3d 266, 272 (4th Cir. 2019) (noting this supports a conclusion that the defendant had not diminished his possessory interest in the phone).

The government nevertheless claims that the delay was appropriate because Ms. Gause and Mr. Mitchell were incarcerated at the time and that diminished their possessory interest in their

phones. However, as defense counsel brought out on cross examination, Ms. Gause was on home confinement in the fall of 2021. And she was the one who had been in possession of all the phones when Anne Arundel authorities seized them, and would have been able to retrieve the phones if they were released by Anne Arundel.

In any event, incarceration does not extinguish defendants' possessory interest in their cell phones. To state the obvious, defendants' interest in their cell phones goes beyond holding the phones themselves. Defendants also have an interest in having access to the information their cell phones contain. Incarcerated defendants can give phones to their family members, for example, and those family members can relay the contents to them. Indeed, those contents are often very important. For example, they will almost invariably contain the defendants' collection of passwords that allow them to access their banking information or medical records. Indeed, the cell phones themselves can contain medical records that defendants need to be able to access, through their family members, in order to ensure they have continuity of care while detained. And cellphones often contain the only images of loved ones, children, parents, friends, that defendants will want sent to them to help remember those they cannot see anymore. Not to mention, cell phones contain phone numbers and other contact information, which can allow detained individuals to keep connected to the rest of the world while incarcerated. Today, almost no one has phone numbers memorized, making access, even through another person, essential. When the government holds onto defendants' phones for longer than necessary, it interferes with their property interests even when they are incarcerated.

Unsurprisingly, courts suppress phones where the government unreasonably delays in getting a warrant to search it even when the defendant is incarcerated. For example, the defendants in *Pratt* and *Tisdol* were incarcerated. *Pratt*, 915 F.3d at 270 (discussing the defendant's prison

phone calls); *Tisdol*, 544 F. Supp. 3d at 226 (noting the defendant was incarcerated). Yet, the Fourth Circuit and the District of Connecticut nevertheless held that the delay in obtaining warrants in those cases (31 days in one case and 34 in the other) was unreasonable. *Tisdol*, 544 F. Supp. 3d at 227; *Pratt*, 915 F.3d at 272. Here, the government's delay of 50 days is substantially longer than in either of those cases.

Finally, the government suggests the delay was justified because there was probable cause to believe the phone contained evidence of the five robberies charged in this case that they were investigating. "In cases where delays in getting a search warrant of short duration (less than a month) have been found unreasonable, ascertaining the contents of the property at issue was necessary to determine whether there was a basis for a criminal charge and, had the search been fruitless, there would have been no charges." *United States v. Wright*, 534 F. Supp. 3d 416, 426 (M.D. Pa. 2021). That is the case here. Neither Ms. Gause nor Mr. Mitchell were charged with the five robberies the FBI was investigating at the time. Instead, the FBI waited until after they got the cell phone warrant and after they searched Mr. Mitchell's phone in order to bring charges.

> ### d. *Suppression is the appropriate remedy here.*

The government argues that suppression is not the appropriate remedy here and instead that the good faith exception applies. Gov. Opp. 16-17.[5] The government is wrong.

---

[5] The case law the government identifies is inapposite. In *Davis v. United States*, 564 U.S. 229 (2011), for example, the Supreme Court declined to apply the exclusionary rule when law enforcement officers acted in reasonable reliance on binding in-Circuit precedent. No such precedent exists here, so this case is irrelevant. *Herring v. United States*, 555 U.S. 135, 141 (2009), for its part, involved a typographical error in a warrant database. Again, not the problem here. And *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) involved a violation of the knock and announce rule, which is not implicated here. These cases tell us nothing about the lawfulness of the FBI and DOJ's actions here.

As Judge Contreras has explained:  "[T]he Supreme Court has held that the proper remedy for an unreasonably long delay in obtaining a warrant following a seizure under the Fourth Amendment is suppression of the evidence." *United States v. Wilkins*, 538 F. Supp. 3d 49, 95 (D.D.C. 2021).  "Procuring a late-obtained warrant cannot be enough to remedy this type of unreasonable delay, because by merit of the type of violation at issue a warrant is always eventually obtained—meaning under this logic the exclusionary rule could not ever operate to deter this Fourth Amendment violation." *Id.*  Arguing about whether exceptions to the good faith rule applies "misunderstands the source of the constitutional violation at issue." *Id.*; *see, e.g., Burgard*, 675 F. 3d 1029, 1035 (7th Cir. 2012) ("When an officer waits an unreasonably long time to obtain a search warrant, in violation of the Fourth Amendment, he cannot seek to have evidence admitted simply by pointing to that late-obtained warrant."); *United States v. Song Ja Cha*, 597 F.3d 995, 1006 (9th Cir. 2010) ("[T]he exclusionary rule is applicable where seizures are unconstitutionally long" to "deter unreasonable police behavior and to provide for judicial determination of probable cause.").

In any event, assuming good faith could in theory apply to unreasonable delay, it does not apply here.  As explained above, the Agent Patrofka and his team (according to his testimony, including AUSA Nelson) exhibited "deliberate," "reckless" or "grossly negligent" disregard of Fourth Amendment rights.  *Davis* v. *United States*, 564 U.S. 229, 236-237 (2011) (deciding not to apply the exclusionary rule where the government had not acted deliberately or in gross negligence).  Here, Agent Patrofka and his team rummaged through Ms. Gause's cell phone extraction for evidence of crimes they had no authority to look for under the Anne Arundel warrant and through categories of evidence that fell outside that warrant's plain terms.  At a minimum, those actions were grossly negligent or reckless.  Indeed, there is considerably evidence of a

deliberate attempt to cover up this Fourth Amendment violation by including a false statement to the Court in the FBI cell phone warrant application.

Furthermore, there is evidence that the constitutional violation here is "the product of recurring or systemic negligence." *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020). Agent Potrafka testified that, at the time of this delay, his office had no policy of obtaining warrants in a timely manner.

4. **The Court should hear from AUSA Nelson.**

As discussed at length above, the current record evidence reflects that the FBI rummaged though Ms. Gause's cell phone extraction in obvious contravention of the Anne Arundel warrant they purported to try on. The record also indicates that, when it came time to submit a warrant for Ms. Gause's phone and the others in FBI custody, the warrant affidavit that was submitted included a patently false statement that the extraction was never reviewed. Agent Potrafka, as discussed, squarely blamed Agent Nelson. According to Potrafka, Nelson knew the extraction was being searched; Nelson gave the incorrect legal advice to search it; and Nelson inserted the false statement that "no one has reviewed the contents" of the aforementioned cell phones and Anne Arudel extraction "pending this search warrant" knowing that was not true. Dkt. 190-1 at 19.

As discussed, defense counsel harbors serious doubts that AUSA Nelson gave such patently incorrect legal advice and knowingly lied to a Magistrate Judge of this Court. Instead, defense counsel suspects Agent Potrafka has misstated, and potentially even fabricated, parts of his story. Because Agent Potrafka and AUSA Nelson were working hand in hand at this time and for other reasons explained above, defense counsel does not believe it matters whether the blame for this misconduct falls at Agent Potrafka and AUSA Nelson's feet. However, if the Court is inclined to think that it matters that Agent Potrafka was taking legal advice from AUSA Nelson, the Court

16

must hear from AUSA Nelson.  Defense counsel suspects that AUSA Nelson will dispute Agent Potrafka's testimony that AUSA Nelson knowingly contravened his ethical obligations and included a lie in a submission to a magistrate judge of this Court.

### Conclusion

For all of the above reasons, those set out in the brief and reply in support of this motion, and stated during the hearings on this motion, Mr. Mitchell, on his behalf and on behalf of his co-defendant Ms. Gause, respectfully requests that the Court suppress the use as evidence of all materials seized as the result of the unconstitutional search of the cellphones, and all evidence derived from the evidence found on the cellphones.  And, if necessary, requests an evidentiary hearing to take the testimony of AUSA Nelson.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

*/s/ Courtney Millian*
COURTNEY L. MILLIAN
DIANE SHREWSBURY
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

17